UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
BERNARD MUTTERPERL,


                              Petitioner,

                                                           **MEMORANDUM & ORDER**
                  -against-                                  13 CV 6028 (RJD)

PATRICK GRIFFIN,
                              Respondent.
-----------------------------------------------------x
DEARIE, District Judge.

      Before the Court is petitioner Bernard Mutterperl's application for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted in 2009, after a jury trial in

Supreme Court, Kings County, of Attempted Kidnapping in the Second Degree (N.Y. Penal

Law, or "P.L.," § 110.00/135.20), Burglary in the Second Degree (P.L. § 140.25[2]), Unlawful

Imprisonment in the Second Degree (P.L. § 135.05) and Endangering the Welfare of a Child

(P.L. § 260.10[1]). He was sentenced to concurrent terms totaling ten years, in custody when he

filed the petition, and released in January 2019.[1]

---

[1] Petitioner was sentenced to concurrent prison terms of ten years plus five years of post-release
supervision on the attempted kidnapping and burglary convictions, and concurrent prison terms
of one year on the unlawful imprisonment and endangerment convictions. According to New
York State Department of Corrections online inmate locator, he began serving his sentence on
September 3, 2009 and was released January 15, 2019. Petitioner's release from custody does
not render the petition moot because continuing collateral consequences from the conviction are
presumed. Spencer v. Kemna, 523 U.S. 1, 8 (1998); Sibron v. New York, 392 U.S. 40, 55-56
(1968).

The charges relate to the attempted abduction of an eleven-year-old girl in the stairwell of the Brooklyn apartment building where she lived. Trial testimony included the victim's account and petitioner's statements admitting that he followed the victim after he noticed her walking down the street, that he "grabbed" her wrist, and that he "had a problem for some time regarding young girls" that made him "go after" them. Trial Transcript ("Tr.") at 517, 526, 566.[2]

Petitioner advances four claims: (i) there was insufficient evidence of "intent to abduct" for purposes of the kidnapping count; (ii) the prosecution's peremptory strike of two white Jewish males was discriminatory under Batson v. Kentucky, 476 U.S. 79 (1986); (iii) portions of the prosecutor's summation deprived petitioner of his right to a fair trial; and (iv) the court abused its discretion by excluding a false confessions expert. Petitioner raised these claims on appeal and all were denied. People v. Mutterperl, 97 A.D.3d 699 (2d Dep't 2012), lv. app. denied, 19 N.Y.3d 1104 (Oct. 30, 2012).

As discussed below, petitioner has not met the formidable standards required to disturb the state court rulings. Accordingly, the application for a writ of habeas corpus is denied and the petition is dismissed.

## FACTUAL BACKGROUND

X.G. testified that she lived with her mother and others in an apartment building on Ocean Avenue in Brooklyn. On the afternoon of May 13, 2007, Mothers' Day, she went to a nearby drug store to buy gifts for her mother. On her walk home, she "saw somebody" she later identified as petitioner "following" her. Trial Transcript ("T"): 264. She noted the "shadow" of

---

[2] The court ruled that petitioner's statement that he had a "problem" with young girls was inculpatory and admissible under People v. Molineux, 168 N.Y. 264 (1901), to prove intent.

a "person behind" her and felt "kind of scared" but continued walking. T: 265. At her building, after her brother buzzed her in, X.G. ran up the stairs and "between the second and third floor [petitioner] caught" her. T: 266. He "grabbed" her "from behind," with one hand "over her mouth," the "other hand around her chest," and his waist against her back. T: 269-70. Petitioner is six feet two inches tall; X.G. was four foot five and just under 100 pounds.

X.G. initially did not recall whether petitioner held her "softly" or "tightly" or "some other way." T: 269. She said his grip was "tight" as "he walked [her] down to the lobby." T: 270. Petitioner did not say where they were going, but told her not to scream. X.G. talked about the leaky roof "[t]o distract" petitioner. T: 285. She "wanted [petitioner] to think that it was going to be easy" and that "she was pretending to go along" while "waiting for [her] opportunity to get away." T: 288.

In the lobby, petitioner "let loose [her] wrist" and X.G. ran outside. T:270. Scared and crying, X.G. pressed several intercoms; her brother Angel and another building resident, Timothy Isaac, came downstairs while another neighbor, Maria Romano, arrived at the scene. X.G. told them: "this man was following me upstairs and brought me down and wanted—I don't know what he wanted to—where he wanted to take me." T: 274. She described petitioner (noting his height and lime-green dress shirt) and said he was inside the building.

Angel telephoned 911 and with Isaac kept watch until police arrived, and saw petitioner, not wearing the green shirt, exit the building.[3] X.G. saw petitioner and "got scared and was screaming." T: 326. She pointed out petitioner to Isaac and Angel and said it "was him." T:

---

[3] Police later found a green shirt wrapped around a yarmulke inside the front of petitioner's pants. Id. at 387.

3

302, 326. Isaac tried to confront petitioner but he ran and Isaac and others followed. When Isaac

caught up to petitioner, he asked him why he was running. Petitioner replied, "I didn't do

anything. Why are you chasing me? The girl is lying." T: 327.

Isaac, Angel and a third man then beat petitioner. Isaac admitted the he kicked and

punched petitioner, while Angel denied participating. Angel confirmed that the screaming that

could be heard on one of the 911 calls when it was played at trial was petitioner while being

beaten. Isaac testified that when petitioner was on the ground, he "screamed and said okay,

okay, I'm sorry, I'm sorry. I won't do it again. I won't touch little girls no more." T: 328. (No

charges were ever brought for the beating.)

The prosecution also introduced statements petitioner made to police. The first was at the

scene: lying on the ground when the police arrived, petitioner said, not in response to

questioning, that he was "scared" and that "he was trying—he was only holding her hand." T:

407, 386. The other statements were the product of interrogation, which began after petitioner

was in a holding cell for 3 hours. Between approximately 6:30 p.m. and 8:50 p.m., after waiving

his Miranda rights, petitioner made a series of progressively inculpatory statements, as follows:

> An unknown person called me this afternoon and told me to pick something up
> from a person that I don't remember his name. And I saw a girl who must be
> around 13 or 14 and I tried to give her a description of the guy. I held on to the
> girl's hand for a second or two and then she started running away... As I got to
> the front door I realized the girl was talking with a bunch of people in Spanish,
> but someone was talking English. And I heard him say a guy with a green shirt . .
> . So I left the building and everyone told me to wait over there. So I said, "why
> do I have to wait? I didn't do anything" . . .. T: 506-507.

A bit later, petitioner stated, in part:

I was sitting on the steps of Touro College and I saw this girl who I thought was
around 16 or 17 years old. I caught up to her on Ocean Avenue. Followed her to
her building. We went up the stairs to between the first and second floor. Then I
tried to get her number. I didn't sexually touch this girl at all. With no intention

4

of it . . . . T: 511-12.

Petitioner soon conceded that the girl did not look 16, and then "admitted that he had a problem for some time regarding young girls" and that "when he sees them he has urges and has to go after them." T: 517.

In a third written statement, petitioner admitted, in pertinent part, as follows:

I Bernard Mutterperl have realized for quite some time over the last two or three years that I have a problem. That when I see young girls I just want to go after them. I also admit that I need help and I am willing to go for it. On Sunday around three p.m. I was sitting on the steps of Touro College on Avenue J with a friend. As my friend went into the college I saw this young girl who was around ten or eleven years old so I started following her to her building because I wanted her number.

As we went up in between the first and second floor I told her "hi" and she said 'hi' back. Because she was a little frightened I said, 'don't scream.' I asked her if she wanted to go for a walk and she said "yes." So we started going down the stairs and the girl started talking about her mother and a leak on the roof until we got to the door in the lobby and the girl started screaming. . . . But I do realize now that I need help and I am willing to go for it. T: 519-520.

A final statement memorialized the following exchange:

Q:    The girl stated you grabbed her by the wrist. You said you held her hand?

A:    At first I held her wrist for one or two steps. Then casually moved to her hand with no force initiated on the girl on my part. T: 527.

## DISCUSSION

### GENERAL HABEAS STANDARDS

**Threshold Requirements: Constitutional Nature of Claim,
Procedural Integrity (Exhaustion, "Independent and
Adequate State Law" Doctrine, and Related Procedural Concerns)**

First and foremost, "federal habeas corpus relief does not lie for errors of state law."

Lewis v. Jeffers, 497 U.S. 764, 780 (1990). Rather, "28 U.S.C. §2254 allows a court to entertain

a habeas petition 'only on the ground that [an individual] is in custody in violation of the *Constitution or laws or treaties of the United States.*'" Garner v. Lee, 908 F.3d 845, 860 (2d Cir. 2018) (quoting, 28 U.S.C. § 2254(a)) (emphasis added).

Second, before bringing bona fide federal claims to the habeas court, the petitioner must first exhaust those claims by fully and fairly presenting the substance of each to the highest state court. See 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."); Picard v. Connor, 404 U.S. 270, 275 (1971) ("federal habeas corpus statute . . . embodies the long-established principle that a state prisoner seeking federal habeas review of his conviction ordinarily must first exhaust available state remedies"); Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir. 1982) ("In order to have fairly presented his federal claim to the state courts, the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court").

The habeas statute also recognizes that where "there is an absence of available State corrective process" or "circumstances that render such process ineffective to protect the [petitioner's] rights," the exhaustion requirement may be waived. 28 U.S.C. §2254(b)(1)(B). The statute also provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

Third, with respect to exhausted, bona fide federal claims, the pool of cognizable claims shrinks further. Under a longstanding principle of habeas jurisprudence, "a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the

6

state court denied based on an adequate and independent state procedural rule." Davila v. Davis, 137 S. Ct. 2058, 2064 (2017); Coleman v. Thompson, 501 U.S. 722, 729 (1991) (habeas claim is procedurally barred if it was decided "on a state law ground that is independent of the federal question and adequate to support the judgment."). This principle "ensure[s] that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." Martinez v. Ryan, 566 U.S. 1, 9 (2012). Importantly, the bar applies "even where the state court has also ruled in the alternative on the merits of the federal claim," which is often the case. Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990). See also Harris v. Reed, 489 U.S. 255, 264 n. 10, (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding") (emphasis in original).

There is some give, however, in this rule. See Garner v. Lee, 908 F.3d 845, 859 (2d Cir. 2018) ("While a state court may rest its judgment on a state procedural bar if it rejects the merits of a federal claim *only in the alternative*, . . . the Supreme Court has admonished that, when in doubt, courts should presume that the state court adjudicated the claim on the merits") (emphasis in original), cert. denied, 139 S. Ct. 1608 (2019). In short, the state court must express the nature of its holding unambiguously. See id. ("for this procedural default rule to apply, the state court must have clearly and expressly stated that its judgment rested on a state procedural bar. . . . In other words, it must be 'clear from the face of the opinion' that the state court's decision rested on a state procedural bar.") (internal quotations, citations, and alterations omitted).

"To bar habeas review ... the state court's decision must rest not only on an independent procedural bar under state law, but also on one that is adequate to support the judgment." Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007) (internal quotation and citation omitted), cert. denied, 552 U.S. 1150 (2008). A state procedural bar "is 'adequate' if it 'is firmly established

7

and regularly followed by the state in question' in the specific circumstances presented." Id. (quoting, Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)). The most common state law procedural ground that arises, the requirement that an issue be preserved by contemporaneous objection, see generally N.Y. Criminal Procedure Law §470.05(2), has been held to be a firmly established and regularly followed rule for these purposes. Richardson v. Greene, 497 F. 3d 212, 217-18 (2d Cir. 2007); Petronio v. Walsh, 736 F. Supp. 2d 640, 653 (E.D.N.Y. 2010).[4] Another frequently encountered state law ground, the rule that a claim based upon a matter of record at trial should be raised on direct appeal and cannot be pursued in a motion for collateral relief under N.Y. CPL §440.10, has also been held to be firmly established and regularly followed. Dominique v. Artus, 25 F. Supp.3d 321, 333 (E.D.N.Y. 2014) (collecting cases).

Importantly, although "adequacy is itself a federal question," Lee v. Kemna, 534 U.S. 362, 375 (2002) (internal quotation and citation omitted), "[habeas courts'] function ... is not to ... peer over the shoulder of the state court judge ruling on questions of state law ... Instead ... we are to determine only whether the state ruling falls within the state's usual practice and is justified by legitimate state interests, not whether the state court ruling was correct." Downs v. Lape, 657 F.3d 97, 101 (2d Cir. 2011) (internal quotations and citations omitted), cert. denied, 566 U.S. 1014 (2012); Lewis, 497 U.S. at 780 ("federal habeas corpus relief does not lie for errors of state law."). Finally, the "independent and adequate state ground" bar may be bypassed only if a petitioner demonstrates either "cause" for failing to comply with the state rule and "actual prejudice" if the claim is not reached, or that a lack of federal review will result in a

---

[4] In the context of challenges to the legal sufficiency of the evidence, this rule requires that a defendant identify the specific evidentiary deficiency rather than merely move for dismissal at the close of the state's case. People v. Hawkins, 11 N.Y.3d 484, 492 (2008).

fundamental miscarriage of justice because he is actually innocent. <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989); <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87 (1977). Most commonly, petitioners attempt to show "cause" through a claim of ineffective assistance of counsel, but to qualify as "cause" for this purpose the ineffectiveness claim must be independently exhausted. <u>Edwards v. Carpenter</u>, 529 U.S. 446, 452 (2000). If a petitioner fails to show cause the Court need not consider whether he would be prejudiced by the failure to reach his claim. <u>Murray v. Carrier</u>, 477 U.S. 478, 498 (1986).

## Substantive Review Standards

The current habeas statute provides in relevant part as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(1), as amended by the Antiterrorism and Death Penalty Act of 1996 ("AEDPA").

The Supreme Court has repeatedly explained that this statute "erects a formidable barrier to federal habeas relief," <u>Burt v. Titlow</u>, 571 U.S. 12, 19 (2013), because it embodies "a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights . . . and are thus presumptively competent [ ] to adjudicate claims arising under the laws of the United States." <u>Id.</u> at 19. Indeed, federal habeas courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." <u>Id.</u> at 16 (internal quotations, citations and alterations omitted). <u>See also</u> <u>Virginia v. Le Blanc</u>, 137 S. Ct. 1726, 1728 (2017) ("In order for a state court's decision to

9

be an unreasonable application of this Court's case law, the ruling must be objectively

unreasonable, not merely wrong; even clear error will not suffice") (internal quotation marks and

citations omitted); <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010) ("AEDPA [ ] imposes a highly

deferential standard for evaluating state-court rulings" and "demands that state-court decisions

be given the benefit of the doubt") (internal quotations omitted); <u>but see</u> <u>Brumfield v. Cain</u>, 135

S. Ct. 2269, 2277 (2015) ("As we have also observed, however, even in the context of federal

habeas, deference does not imply abandonment or abdication of judicial review, and does not by

definition preclude relief.") (internal quotation marks, citation and alterations omitted).

As the Supreme Court has recently reiterated:

> The federal habeas statute … imposes important limitations on the power of
> federal courts to overturn the judgments of state courts in criminal cases. The
> statute respects the authority and ability of state courts and their dedication to the
> protection of constitutional rights. Thus, under the statutory provision at issue
> here, 28 U.S.C. §2254(d)(1), habeas relief may be granted only if the state court's
> adjudication "resulted in a decision that was contrary to, or involved an
> unreasonable application of," Supreme Court precedent that was "clearly
> established" at the time of the adjudication. … This means that a state court's
> ruling must be so lacking in justification that there was an error well understood
> and comprehended in existing law beyond any possibility for fairminded
> disagreement.

<u>Shoop v. Hill</u>, 139 S. Ct. 504, 506–07 (2019) (internal quotations and citations omitted). <u>Accord</u>

<u>Orlando v. Nassau Cty. Dist. Attorney's Office</u>, 915 F.3d 113, 121 (2d Cir. 2019) ("unreasonable

application" standard of § 2254(d)(1) is a "bar [that] is not reached where fairminded jurists

could disagree on the correctness of the state court's decision") (internal quotation and citation

omitted). In short, "[i]f this standard is difficult to meet—and it is—that is because it was meant

to be." <u>Burt</u>, 571 U.S. at 20 (internal quotations, citations and alterations omitted).

Alternatively, under the less frequently invoked second branch of § 2254(d), a petitioner

may seek habeas relief by challenging the factual basis of the adverse state court ruling. <u>See</u> 28

U.S.C. §2254(d)(2) (habeas court may overturn the state court's decision only if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceedings." Id. A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010). Further, 28 U.S.C. § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[5]

Finally, "[d]eciding whether a state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of the facts requires the federal habeas court to train its attention on the particular reasons—both legal and factual— why [the] state courts rejected a state prisoner's federal claims…and to give appropriate deference to that decision." Wilson v. Sellers, 138 S. Ct. 1188, 1191-92 (2018) (internal quotations and citations omitted). When the last state court decision is a simple affirmance, denial of leave, or otherwise not accompanied with reasons, Wilson "hold[s] that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." Id. at 1192.

---

[5] The Supreme Court and the Second Circuit have declined to address the relationship between §2254(d)(2) and §2254 (e)(1). See Brumfield, 135 S. Ct. at 2282 ("We have not yet defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)") (internal quotation and citation omitted); Garguilio v. Heath, 586 Fed. App'x 764, 766 n. 1 (2d Cir. Oct. 10, 2014).

## ANALYSIS OF PETITIONER'S CLAIMS

## I.    Sufficiency of the Evidence

Petitioner argues that the evidence was legally insufficient to establish his guilt of attempted kidnapping in the second degree because there was no evidence that he "intended to secret[e]" X.G. or "hold her in a place where she was not likely to be found." Petition at p. 6. Petitioner raised this claim on his direct appeal, and the Appellate Division rejected it on the merits. Mutterperl, 97 A.D.3d at 699 ("Viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish [petitioner's] guilt of attempted kidnapping in the second degree beyond a reasonable doubt."). The court held that the requisite intent "may be inferred from [petitioner's] conduct and the surrounding circumstances." Id. (The court also held that the verdict was not against the weight of the evidence. Id.)

The standards for evaluating a sufficiency claim on habeas are well-established and formidable. See Jackson v Virginia, 443 U.S. 307, 318-319 (1979); Cavazos v. Smith, 565 U.S. 1, 2 (2011) (reaffirming that Jackson controls in § 2254 context).

Under Jackson,

> the critical inquiry . . . does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

Id. 443 U.S. at 318-319 (internal quotations and citations omitted) (all emphases supplied by *Jackson* Court).

In short, under Jackson, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Where the state has first rejected the sufficiency claim on the merits, federal habeas deference is doubled. Cavazos, 565 U.S. at 2 (the "the deference to state court decisions required by § 2254(d)" is to be "applied to the [ ] already deferential review" of Jackson").

The Court concludes that the Appellate Division did not unreasonably apply these standards when holding that petitioner's intent to kidnap X.G. can be inferred from his conduct and the surrounding circumstances. Under New York law, a person is guilty of kidnapping in the second degree "when he abducts another person." PL § 135.20. "Abduct" means "to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly physical force." PL § 135.00(2). The same mental state is required for the attempt version of the crime. See PL § 110.00 ("[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime").[6]

---

[6] Further, to constitute an attempt, a defendant's "conduct must have passed the stage of mere intent or mere preparation to commit a crime." People v. Mahboubian, 74 N.Y.2d 174, 189 (1989). The defendant "must have engaged in conduct that came 'dangerously near' commission of the completed crime." People v. Naradzay, 11 N.Y.3d 460, 466 (2008) (internal quotation and citation omitted). "The 'dangerously near' standard does not, however, mandate that the defendant take the final step necessary to complete the offense." Id. (internal quotation and citations omitted).

Petitioner appears to argue that the restraint he exercised when initially gripping X.G. is not sufficient to establish intent to abduct because the stairwell could not qualify as a "place where [the victim] is not likely to be found" within the meaning of the Penal Law, and there is no evidence that he intended to "secrete" or "hold" her in some other such place. In the state appellate brief where he raised the same claim, petitioner relied heavily on X.G.'s account of the incident, emphasizing that his hold on X.G. was "fleeting" (lasting only a matter of seconds) rather than "restraining," ECF Doc. 801 at p. 36, that he "walked" her down the stairs without force or violence, and that when they reached the lobby he loosened his grip (or "let loose [his] grip," as X.G. testified). He further argued that he loosened his grip because he realized that she had misinterpreted his actions and that all he wanted to do was take her for a walk. Id.

Petitioner, however, misses the proverbial forest for the trees as he overlooks the totality of the circumstances and his statements. Viewed in the light most favorable to the prosecution, these materials plainly establish intent to abduct beyond a reasonable doubt under New York law. People v. Antonio, 58 A.D.3d 515 (1st Dep't), lv. app. denied, 12 N.Y.3d 814 (2009), a second-degree attempted kidnapping case from the First Department relied on by the Second when affirming petitioner's conviction, is illustrative. In Antonio, the defendant followed an 11-year-old girl out of a restaurant. Sensing the man's presence, she ran towards an adult bystander who tried to protect her as the defendant reached for her hand and said (falsely) that he was her father. The defendant suddenly fled when he saw a passing police car.

In holding that the evidence was legally sufficient, Antonio, 58 A.D.3d at 516, the First Department concluded that the defendant "evinced his desire to gain control over the girl" when he told the bystander he was the girl's father and that he "demonstrated his intention to restrain" the girl by reaching for her hand. Id. As for the required "secreting or holding . . . in a place

14

where [s]he is not likely to be found," the court reasoned that, "because [the defendant] knew that the girl not only did not welcome his advances, but had run from him and screamed for help, it was not unreasonable for the jury to conclude that whatever defendant intended to do with the girl once she was restrained would not be done in public." Id.

Petitioner did more than the defendant in Antonio to evince an intent to control and restrain because he not only followed and reached for X.G. but actually secured her wrist, covered her mouth, told her not to scream, and began the process of bringing her to some other location (thwarted only because the girl managed to escape)—all while knowing that she was scared, and that he had "urges" that made him "go after" young girls. Under these circumstances, a rational juror could readily conclude, as in Antonio, that "whatever [petitioner] intended to do with the girl once she was restrained would not be done in public." Id., 58 A.D.3d at 516.[7] Petitioner's sufficiency claim therefore fails as a basis for habeas relief.

## II.      Exclusion of Expert Testimony on False Confessions

Petitioner claims that the trial court abused its discretion and violated his right to a fair trial by declining to allow him to present expert testimony on false confessions without first holding a Frye hearing[8] to assess whether the principles about which the expert would testify were generally accepted in the scientific community. The Appellate Division rejected this claim

---

[7] Additionally, as the prosecution argued in summation, T: 703, there was testimony from which the jury could rationally have inferred that petitioner was attempting to take X.G. into the right side of the building where two apartments were known to be under renovation and empty. See T: 451, 461 (Romano testified that X.G. told her that petitioner "took her to the right side" and "pulled her to the right") and T: 365-368 (a detective testified to the layout of the lobby, the two staircases, and the vacant apartments in the right wing).

[8] See Frye v. United States, 293 F. 1013 (Ct. App. D.C. 1923).

on the merits. Mutterperl, 97 A.D.3d at 700 ("[i]n the context of this case, the Supreme Court providently exercised its discretion in precluding expert testimony on false confessions").

The admissibility of false confession expert testimony is purely a matter of New York law and so does not present a constitutional question cognizable in a federal habeas court. See generally 28 U.S.C. § 2254; Lewis, 497 U.S. at 780 ("federal habeas corpus relief does not lie for errors of state law."). The guiding authority is the New York Court of Appeals decision in People v. Bedessie, 19 N.Y.3d 147 (2012), which holds, first, that "in a proper case expert testimony on the phenomenon of false confessions should be admitted." Id., 19 N.Y.3d at 149. Bedessie also holds that admissibility remains a matter of the trial court's discretion:

> the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court, which should be guided by whether the proffered expert testimony would aid a lay jury in reaching a verdict; courts should be wary not to exclude such testimony merely because, to some degree, it invades the jury's province; despite the fact that jurors may be familiar from their own experience with factors relevant to the reliability of the evidence at issue, it cannot be said that psychological studies' bearing on reliability are within the ken of the typical juror.

Id., 19 N.Y.3d at 156 (internal quotations and alterations omitted).

Although the trial court's decision to exclude pre-dates Bedessie, the Appellate Division's holding here—that the trial court "providently exercised its discretion" in excluding the expert—cites Bedessie as the controlling standard. It is not this Court's role to second-guess the Appellate Division's view of the matter. See Estelle v. McGuire, 502 U.S. 62, 67-68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

Petitioner's bootstrapped claim that the exclusion of false confession expert testimony deprived him of his constitutional right to a fair trial is plainly meritless. There is no Supreme

16

Court case recognizing a right to introduce such evidence. Rather, "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (internal quotations and citations omitted). See also Rock v. Arkansas, 483 U.S. 44, 55 (1987) ("the right to present relevant testimony is not without limitation" and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process") (internal quotation and citation omitted). Petitioner fully utilized the meaningful opportunities afforded him to present the circumstances under which he made his statements and to challenge their voluntariness, both in a pre-trial Huntley hearing, see generally People v. Huntley, 15 N.Y.2d 72 (1965), and at trial through cross-examination of the state's witnesses and a vigorous summation by counsel. T: 684 et seq.[9] Therefore, his challenge to the exclusion of the false confession expert does not present a basis for habeas relief.

## III. Improper Summation

Petitioner claims he was denied his due process right to a fair trial by prosecutorial improprieties during summation. The Appellate Division, citing New York Criminal Procedure Law § 470.05[2], held that this claim was "unpreserved for appellate review" because petitioner "either failed to raise any objections to the challenged remarks or failed to seek further relief after objections were sustained and curative instructions given." Mutterperl, 97 A.D.3d at 700. In the alternative, the court rejected the claim on the merits, holding that, "[i]n any event, the

---

[9] The court denied petitioner's pre-trial motion to suppress his statements in a written decision. ECF Doc. 8-1 at pp. 15-18. At trial, the court instructed the jury that it could not consider any statement of petitioner "as evidence in the case until the People have proven beyond a reasonable doubt that [petitioner] made the statement voluntarily," T: 724, and further instructed on how to determine voluntariness. T: 724-25. Petitioner does not challenge those instructions or the admission of his statements as a separate ground for habeas relief.

challenged remarks were either fair comments, responsive to the defense's summation, or within the bounds of permissible rhetorical comment." Id.

Without reaching the question of whether the claim is procedurally barred by the independent and adequate state law doctrine,[10] the Court concludes that the claim does not present a basis for habeas relief. As the Supreme Court has cautioned, a criminal conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone." United States v. Young, 470 U.S. 1, 11 (1985). On collateral review, the standard is particularly formidable. See generally Darden v. Wainwright, 477 U.S. 168, 181 (1986) (test is not whether prosecutor's statements to the jury were "undesirable or even universally condemned.... The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process") (internal quotation and citation omitted).

Viewed against this standard, petitioner's claim borders on the frivolous. Principally, he complains that the prosecutor ridiculed his injuries by saying that in an arrest photo "[h]is nose is a little swollen" and "[h]e has a little mark under the left eye...That's it." T: 707. He complains that one of his interim—and obviously partially false—statements to police was described as "ridiculous." T: 712. He also asserts that the prosecutor impermissibly vouched for her own

---

[10] As discussed supra at pp. 8-10, New York's contemporaneous objection rule, CPL §470.05[2], has been held to be a firmly established and regularly followed rule for purposes of this doctrine. Richardson, 497 F. 3d at 217-18; Petronio, 736 F. Supp. 2d at 653. Mindful that "adequacy is itself a federal question," Lee, 534 U.S. at 375 (2002) (internal quotation and citation omitted), the Court observes that, to declare the prosecutorial conduct claim procedurally barred, the Court would have to agree with the Appellate Division's implied ruling that Section 470.05[2] requires a defendant to "seek further relief" after objecting. Mutterperl, 97 A.D.3d at 700. The Court would also have to hold that any such post-objection requirement is firmly established and regularly followed. In the absence of briefing on these issues, and because the claim lacks merit in any event, the Court declines to reach these components of the procedural question.

18

witness and appealed to jury sympathy by saying, inter alia, that X.G.'s testimony has the "ring of truth," id. at 698,[11] and that petitioner was a predator and "[e]very parent's worst nightmare." T: 717. Petitioner also says the prosecutor mischaracterized evidence by stating that petitioner "pull[ed]" X.G. down the stairs. T: 717.

The Appellate Division's determination that the challenged remarks did not require reversal of petitioner's conviction is plainly not an unreasonable application of the Supreme Court standards,[12] which tolerate significantly more objectionable rhetoric than the prosecutor used here. In any event, in response to objections by defense counsel the trial court issued appropriate curative instructions throughout the prosecutor's summation, advising the jury, inter alia, that they were hearing argument of counsel, not evidence, and that their recollection of the evidence rather than the attorneys' controlled. See, e.g., T: 698, 700, 705, 717. And when the defense objected to "every parent's worst nightmare" as "inflammatory," the court instructed the prosecutor to "[m]ove along off that language." T: 717.

## IV.    The **Batson** Claim

During round one of jury selection, when the prosecution used peremptory challenges to strike Joseph Nathan and Albert Nitzburg, the court noted, "For purposes of keeping a record for the Batson challenges," both Nathan and Nitzburg are "white Jewish male[s]." T: 113. During round two, with ten jurors selected, defense counsel complained: "We . . . have a problem, there are no Jews on the jury…My client is Jewish. He is entitled to have at least some of his peers on

---

[11] The prosecutor also argued that petitioner's statement that he has "urges" and "is compelled to go after young girls" likewise had a "ring of truth." Id. at 712.

[12] AEDPA deference applies to alternative merits rulings in this context. See, e.g. Wright v. Griffin, 2017 WL 5514180, at *6 (E.D.N.Y., Nov. 16, 2017) (collecting additional authorities).

the jury." T: 182-83. Counsel referenced the peremptory striking of Nathan and Nitzburg, and the court asked counsel to clarify whether he was making a formal <u>Batson</u> challenge or instead complaining that too few Jewish individuals were in the venire or placed in the box. During the colloquy, the prosecutor volunteered, "With respect to the two jurors from the prior panel, I am secure at this time . . . I do have race neutral reasons why I challenged [them]." T: 187-88.

Without first making the step-one <u>Batson</u> finding—namely, that petitioner had made a prima facie showing that the prosecutor had exercised peremptory challenges on the basis of race (see discussion *infra*)—the trial court simply responded to the prosecutor by asking that she "come forward with [those] race neutral reasons." T: 188. The prosecutor stated:

> With respect to ... Mr. Nathan, he specifically said that he had students that he was responsible for and that, in fact he might be distracted. While the Court rehabilitated him [sic] that he would be able to put this aside, he still said he might be distracted during the course of the trial and deliberation. I also do note that he was one of the jurors who came up initially to be excused.[13]
> With respect to Mr. Nitzburg...[he] was assaulted by a 17-year-old. In this case the defendant was assaulted by an 18-year-old...the brother of the victim is 18...one of the allegations in this case is that the brother of the victim assault[ed] the defendant. T: 188-89.

The court then ruled: "The prosecution in this particular case just needs to come forward with race neutral reason[s] and is fine under these circumstances that [the prosecutor] has done so." T: 190.[14]

Petitioner claims here, as he did on appeal, that the trial court erred in denying his <u>Batson</u> challenge to the prosecution's peremptory strike of venirepersons Nathan and Nitzburg. The

---

[13] The record confirms that before any venireperson was questioned Mr. Nathan spoke to the court about work constraints related to his availability to serve. T: 38.

[14] The Appellate Division treated the transcript's attribution of this statement to defense counsel rather than the court as a typographical error, as the parties do here.

Appellate Division rejected the claim, finding that "[t]he prosecutor provided a race-neutral explanation for excluding the prospective juror at issue," and that "[t]he trial court's determination that this explanation was nonpretextual is entitled to deference ... and should not be disturbed where, as here, it is supported by the record." Mutterperl, 97 A.D.3d at 700.

The Court has been shown no reason to disturb the state court's rulings.

The three-step process for determining when a strike is discriminatory has not changed in three decades of Batson jurisprudence: "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." Foster v. Chatman, 136 S. Ct. 1737, 1747 (2016).

Here, only Batson's third-step requires discussion.[15] Under Supreme Court holdings, "[t]hat step turns on factual determinations, and, in the absence of exceptional circumstances, we defer to state court factual findings unless we conclude that they are clearly erroneous." Foster, 136 S. Ct. at 1747. See also Rice v. Collins, 546 U.S. 333, 338 (2006) ("a federal habeas court can only grant [the] petition if it was unreasonable [under 28 U.S.C. §2254(d)(2)] to credit the prosecutor's race-neutral explanations"); Hernandez, 500 U.S. at 365 (a "trial court's decision on

---

[15] The prosecutor's explanations here unquestionably are facially neutral. See Hernandez v. New York, 500 U.S. 352, 360 (1991) (an explanation is "neutral" if it is "based on something other than the race of the juror"). Further, as occurred here, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Id. at 359.

the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference" because "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation … should be believed… and the best evidence will often be the demeanor of the attorney").

Construed most liberally, petitioner's argument does appear to be, as the trial court remarked, that there were too few Jewish individuals in the venire pool. But for purposes of the petition, petitioner has simply not offered this Court *any* bona fide reason for overturning the Appellate Division's decision to defer to the trial court's decision to credit the prosecutor's facially neutral explanations. His <u>Batson</u> claim therefore fails as a basis for habeas relief.

## CONCLUSION

For all the reasons discussed, the application of petitioner Bernard Mutterperl for relief under 28 U.S.C. § 2254 is denied in its entirety. Further, because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
August 16, 2019

S/Raymond J. Dearie
RAYMOND J. DEARIE
United States District Judge